[PHILADELPHIA, APRIL 16, 1835.]

| 5 R | 323 |
| 204 | ² 35 |
| 5 R | 323 |
| 217 | 208 |
| 5r | 323 |
| e224 | ²341 |

In the matter of HARLAND'S Accounts.

. APPEAL.

The report of an auditor adjudicating upon facts, ought not to be set aside, except for plain mistake, which it is the business of the exceptant to establish by affirmative evidence where it is not self-evident in the report.

A commission of rather less than five per cent. allowed a .guardian, the estate being large and attended with responsibility and labour.

A father who is of ability to support and educate his child, is not entitled to charge for his maintenance and education, and the expenses of his voyage abroad.

There is no rule in Pennsylvania that compound interest may not be charged in case of corruption.

But where the estate has been managed with fidelity and no unnecessary delay in investing, the guardian is chargeable only with the interest actually made on sums invested, computed from the date of each investment; and with simple interest on the uninvested sums retained in his hands, computed from the receipt of each.

THIS case arose upon an appeal from a decree of the Orphans' Court of the city and county of Philadelphia, made without argument, confirming the report of the auditors in the matter of the accounts of *John Harland, Junior,* guardian of *Charles D. Harland.*

*John Harland, Junior,* began to act as guardian of the estate of his son *Charles D. Harland,* on the 21st day of December, 1807. *Charles D. Harland* became of age on the 26th day of March, 1828, and on the 31st of the same month assigned all his estate to *James Schott* and *Charles Roberts* in trust for certain purposes. On the 18th July, 1828, *John Harland, Junior,* filed his accounts as guardian, which were referred to auditors: and at the request of the parties the accounts were extended to the 31st March, 1828, when the estate passed to the trustees.

The auditors stated two accounts, a general guardianship account and an interest account. The general guardianship account debited the guardian with the amounts of money actually received, and the amounts of interest receivable by him from investments made by him, and credited him with commissions at two and a half per cent. and with his expenditures in the management of the estate.

Into this account passed the balance of an interest account. It included two schedules. Schedule No. 1, was a series of accounts; the first relating to the affairs of the first year of the guardianship; the others severally relating to the transactions of each succeeding period of six months. The Dr. side of each of these accounts showed the amount of moneys actually received by the guardian within the particular period, and the amount of interest receivable by him within the same period from the investments which he had

(In the matter of Harland's accounts.)

made.    The Cr. side exhibited first, an allowance to him for commissions of two and a half per cent. on the amount of debits, and secondly, such amount as. it appeared by the evidence before the auditors, that he had expended in the management of the estate. The balance of each of these accounts was carried to schedule No. 2.    In schedule No. 2, interest at six per cent. was charged for, and against the guardian, on the several balances ascertained by the accounts in schedule No. 1, to have been due to, or from him, at the periods when those accounts respectively close.    The interest was calculated from those periods to the 31st day of March, 1828 :—and the balance of the interest account, so framed, passed into the general guardianship account.

The effect of thus stating the interest account is, that the guardian is allowed an average time of three months, in which to collect the interest moneys due the estate, and to make investment of them, —that his commissions are set off to him at the times when the moneys came into his hands,—that as to investments made by him, he is credited with the amounts actually invested, as if they had been made to produce six per cent.—and that he is debited with interest at that rate, only on the amounts, less his commissions, which at the expiration of the average time of three months he had omitted to invest at all.    This charge of interest appeared the more reasonable to the auditors, as it was not shown that the moneys of the ward's estate were kept by the guardian distinct and separate from his own.    The estate of the ward, moreover, being altogether in money, no reservation by the guardian was thought necessary for contingent expenses.

The testimony of real estate brokers was adduced by the trustees for the purpose of showing that several mortgages, investments of the ward's money, were purchased by the guardian at a discount, while in his accounts he had credited himself with the whole amount of the principal with interest from the day of purchase.

*Joseph Gibbons* testified, that he had once sold Mr. *Harland* a mortgage assigned by *J. B. Wallace* for five thousand dollars, many years ago, to the best of his recollection at a discount of *sixty* dollars.

*Isaac Elliott* testified, that he had had one transaction of putting out money for Mr. *Harland* in 1817.    He purchased a mortgage from Mr. *Andrews* and the witness of one thousand three hundred dollars, the mortgagee was *Knecht*, 1833-34.    There was a deduction from the amount.    He paid less than par—could not say how much—not less than ten per cent.    It was a time when money was scarce.    It was a bonus given for the money.    There were extensive transactions at that time in assignments of mortgages, in which large discounts were allowed.    Witness had known ten per cent. frequently given.    It was almost impossible to do business at that

time in any other way. He never could do any thing with *Harland* at less than ten per cent. Witness made a number of efforts to do business with *Harland* but could not succeed except on that occasion. He was particular as to the securities, and the discount was frequently an objection.

The auditors credited the guardian in all cases of old mortgages with the principal and interest calculated to the day of purchase without allowing any discount, except in the cases of *Wallace's* and *Knecht's* mortgages.

The testimony of several real estate and stock brokers was adduced by the guardian, for the purpose of showing the pains taken by him to loan the ward's money—and that he had obtained the best interest that could be procured.

The auditors disallowed a claim made by the guardian, for the support, maintenance and education of his son, on the ground that he being confessedly of full ability to support and educate him in a proper manner, he was bound to do so without drawing the means from the ward's fortune; and on the same principle they disallowed a claim for moneys advanced for the expenses of a voyage by the ward to England.

The following exceptions were taken by the trustees of *Charles D. Harland*, to the report of the auditors:

First exception.—To the amount of the semi-annual balances reported by said auditors,

For that, first, the said guardian is credited with the whole amount for which the mortgages, purchased by him, appeared to have been given, although it was in evidence that such securities were for a long time at a considerable discount.

Second, the interest on said mortgages accruing between the last day of payment, and the time they were purchased by him, has been credited to the guardian without proof that he had actually paid it.

Second exception.—To the interest account as stated by the auditors aforesaid.

For that no rests have been allowed, during a period of twenty years, although no investments were made by the guardian under the direction of this court, nor were the accounts of the minor kept separate and distinct from those of the guardian, the securities being taken in his own name generally.

Third exception.—To the allowance of commissions as made by the auditors.

For that, first, the guardian is not entitled to claim any commissions, as he has not managed and discharged the trust confided to him according to law.

Second, the rate of per centage is too high, and charged upon too large a sum.

(In the matter of Harland's accounts.)

Third, the sum allowed is more than a just compensation for the care and trouble of the guardian in the management of the said minor's estate.

The report was also excepted to by the guardian, for the following reasons:

First, That the auditors have not admitted, but have disallowed the charges made by the guardian for the support, maintenance and education of the ward, and also, for debts paid for him, and also for his travelling expenses.

Second, That the auditors have allowed to the guardian a commission wholly inadequate to his care and trouble; that is to say, a commission of two and a half per cent. on the amount of the debits in the account B. schedule, No. 1, when he should have been allowlowed a commission of five per cent. on the amount of moneys received by him.

Third, That the auditors have charged the guardian interest when no interest ought to have been charged to him, and at a higher rate than was obtained, or could have been obtained for the money of the ward upon any safe investment.

Fourth, That the auditors have adopted a rule in making the charge of interest against the guardian, not authorised by law, nor justified by the facts of the case, inasmuch as it was proved to the auditors, that the guardian kept the moneys of the ward separate and distinct from his own, and used all due diligence to keep them invested; and they have charged him interest on all the moneys of the ward, which were collected or received, or which ought to have been collected, or received, allowing an average of three months, to make investments; instead of charging him with the interest actually received by him and credited to the ward.

The report having been confirmed by the court, an appeal was taken, and it was argued at great length, by

*Williams* and *Meredith* for the trustees; and by

*Chauncey* and *Sergeant* for the guardian.

For the trustees, it was contended,

1st. That the report of the auditors was erroneous, in crediting the guardian with the whole amount of the principal of mortgages, with interest calculated to the day of purchase; and that in no instance had a mortgage been credited to the ward at a discount. In the cases of *Knecht's* and *Wallace's* mortgages, it had been proved that they were purchased at a discount; yet the ward was charged by the guardian with the whole amount of principal and interest. They contended that under these circumstances, the burthen of proof lay on the guardian, to show what he had paid for all the mortgages.

2d. They contended that the mode of charging interest against the guardian was just, and by no means too severe. This was the

(In the matter of Harland's accounts.)

case of a guardian who as the auditor had reported, had not kept separate accounts; and had mingled his own with his ward's money. *Baker* v. *Richards*, 8 *Serg. & Rawle*, 15. *Pim* v. *Downing*, 11 *Serg. & Rawle*, 66; who had not collected regularly. *Barron* v. *Rhinelander*, 3 *Johns C. C.* 615; nor invested regularly. The rule is that unless the guardian proves that he could not invest and keep separate and distinct accounts, he is to be charged with interest. *Fox* v. *Wilcox*, 1 *Binn.* 194. *Findlay* v. *Smith*, 7 *Serg. & Rawle*, 264. *Flintham's appeal*, 11 *Serg. & Rawle*, 16. *Com.* v. *Mateer*, 16 *id.* 420.

This is a fair case for charging the guardian with interest. Then by what rule?

The auditors have adopted the rule established in merchants' accounts.

The aggregate receipts for six months, are carried forward, and so also, the aggregate investment, and the balance is the sum on which interest is charged. It is the same in principle, as if each receipt, and each investment had borne simple interest from its date. However proper this may be, in the case of merchants' accounts, where there is a right to draw at any moment, and where there are mutual accounts, and frequent settlements, the reason does not hold with accounts of the guardian, in whose hands the money remains for years. Nothing less than compound interest will indemnify the ward. It is in the power of a mortgagee, or other creditor, to compound by getting judgment for the debt and interest; and ought a ward who is not *sui juris*, to be in a worse situation? The act of assembly requires a guardian to account every three years. If he had done his duty in so accounting, there would have been triennial rests. Certainly he cannot take advantage of his own neglect of duty  They further cited, *Say* v. *Barnes*, 4 *Serg. & Rawle*, 112. *Baker* v. *Richards*, 8 id. 16. *Pim* v. *Downing*, 11 *Serg. & Rawle*, 66. *Johnson's appeal*, 12 id. 324. *Bonsall's appeal*, 1 *Rawle*, 266. *English* v. *Harvey*, 2 id. 305. *Clarkson* v. *Depeyster, Hopkins. C. R.* 424. *Dunscomb* v. *Dunscomb*, 1 *Johns. C. C.* 508. *Merrick's appeal, Ashmead's Rep.* 305. *Schieffelin* v. *Stewart*, 1 *John. C. R.* 620.

3. On the point of commissions, they cited *Pusey* v. *Clemson*, 9 *Serg. & Rawle*, 209. *Walker's estate*, id. 223.

4th. The charges made by the guardian for the support, maintenance, and education of the ward, cannot be admitted, the guardian being of sufficient ability. On this head, they cited, *Hughes* v. *Hughes*, 1 *Bro. C. C.* 387. *Jackson* v. *Jackson*, 1 *Atk.* 513. *Butler* v. *Butler*, 3 *Id.* 60. *Faulkner* v. *Watts*, 1 *Id.* 408. *Darley* v. *Darley*, 3 *Id.* 399. *Roach* v. *Garvan*, 1 *Ves.* 160. *Andres* v. *Partington*, 1 *Bro. C. C.* 60. 2 *Roper on Leg.* 217. 1 *Mad. Ch.* 142. *Jeffries* v. *Jeffries*, 3 *Atk.* 122. *Walker* v. *Shaw*, 15 *Ves.* 122. *Mundy* v. *Hood*, 4 *B. C. C.* 224. *Heyward* v. *Cuthbert*, 4 *Dessauss.* 445. *Cruger* v. *Haywood*, 2 *Id.* 110. *Dane* v. *Howard*, 4 *Mass.* 97. *Billingsley* v. *Cucket*, 1 *Bro. C.*

(In the matter of Harland's accounts.)

C. 268.  *Miles* v. *Wister*, 5 *Binn.* 477.  *Palsford* v. *Hunter*, 3 *Bro. C. C.* 416.  *Reeves Dom. Rel.* 324.

For the guardian it was argued,

1st. That the charges for support, travelling expenses, &c. ought to have been allowed.  The general rule of law, as stated by the counsel on the other side, is not to be controverted, but it is not to be extended beyond its reason.  That reason is, the obligation of the parent to maintain and educate his child, according to his condition in life, and has reference altogether to the condition of the parent. But where the child has a large fortune, there may be a difference. In England, the parent may obtain an allowance by order of chancery.  Here he must act, and justify afterwards.  In this case the parent could maintain and educate; but not in correspondence with the child's fortune.  It is desirable that the court should lay down a rule, which may be a guide in future cases.  On this point were cited, *Sherwood* v. *Smith*, 6 *Ves.* 454. *Sisson* v. *Shaw*, 9 *Id.* 285. *Darlington ex parte*, 1 *Ball & B.* 246. *Maberly* v. *Turton*, 14 *Ves.* 499. *Cooper's cases*.

2d. That the guardian was legally and equitably entitled *to* a commission of five per cent. on the amount received by him.  That this was no more than a just and reasonable compensation for his care, trouble, and responsibility.  In the twenty years of the guardian's service, the estate did not suffer the loss of a dollar, and had been more than doubled.  There was no ground for a charge of infidelity, and this being the case, any thing less than the commission would be dealing a hard measure of justice to the guardian.

3d. As to the interest, the guardian is to be charged according to one of three principles,—that suggested by himself; that proposed by the trustees, or that created by the auditors.  By the first, if the guardian has acted faithfully, he is chargeable with the interest he has actually made, and no more.  By the second, he is chargeable with the interest compounded at short rests, and by the last, he is charged with interest on all moneys receivable, allowing sixty days for investment.  The question to be decided is, which of these principles is the legal and correct one?  The first appears to be the most reasonable, and has the sanction of authority to support it.  It supposes fidelity and vigilance; and leaves it open to the opposite party, to show the want of them, to induce the application of a stricter rule, or to apply what may be considered a mulct or penalty on the guardian.  If he is faithful and vigilant, what more can be reasonably asked for, than the actual fruit of the guardianship.  On what principle ought he to be required to pay more, than has been earned by a faithful and vigilant man.  If it be said, that more might possibly have been made, and he shall be chargeable with all that might possibly be made, surely no man of real wisdom and integrity, would accept the trust on such terms.

(In the matter of Harland's accounts.)

The rule suggested by the trustees of compounding the interest, is applied in no case, but as a penalty for misconduct: and from its severity, it should be applied in no other case.    It is said to be the rule of common life.    It is only necessary to state what is the rule, and the reason of it; to show its inapplicability here.    In the one case, the party is a debtor to pay interest.    In the other, a trustee to take care and earn interest.

The rule assumed by the auditors, is objectionable on two grounds, first, because it assumes that the guardian might collect interest, and put out to interest within three months; and secondly, because it charges him with six per cent., when he could make but five.    The great objection to these rules is, that they may do the greatest injustice; they may charge a man with much more, than he could possibly have made.  The case before the court, is of a father, desiring to do the best for his son and ward, and having the strongest incentive to vigilance and fidelity.    It is wrong to suppose, that he would voluntarily omit to do what was for his son's interest, and such a supposition is certainly negatived by the evidence, from which it is perfectly clear, that at several periods, only five per cent. could be obtained.

The decisions cited on this point, were, *Ekins* v. *East India Company*, 1 *P. Wms.* 396. *Forbes* v. *Ross*, 2 *B. C. C.* 430. *Clarkson* v. *de Peyster*, 1 *Hopk. Ch.* 424. *Pim* v. *Downing*, 11 *Serg. & Rawle*, 67. *Johnson's Appeal*, 12 *Id.* 317. *Bonsall's Appeal*, 1 *Rawle*, 266. *English* v. *Harvey*, 2 *Id.* 305. *Walker's Est.*, 3 *Id.* 250. *Say* v. *Barnes*, 4 *Serg. & Rawle.*

The opinion of the court was delivered by

Gibson, C. J.—The exception to the semi-annual balances, taken by the trustees, depends on matter involving distinct grounds of fact—the supposed proof that some of the mortgages were had at a discount—and the supposed want of proof that the accountant had paid the interest which accrued between the last day of its payment and the day of purchase.

The cause has been argued on this exception, as if the matter were *res integra*.    The degree of weight due to a report of auditors has not I believe been determined; but the parties certainly do not stand here as they stood at the hearing.    It was the business of the auditors not merely to collect proofs for adjudication by the court, but to adjudicate themselves subject to exceptions, and that they report the proofs at all, is but to assist the court in the determination of those exceptions.    They may, if they think fit, refer the facts to the court upon the proofs, and when specifically instructed, it is their business to do so; but here their authority was unlimited, and they have exercised it by an adjudication which comes to us with the testimony, but possibly not with all the concessions on which it was

(In the matter of Harland's accounts.)

founded. It seems reasonable that such a report, like the verdict of a jury, or an award of arbitrators under the act of 1705, be not set aside in whole or in part, except for plain mistake, which it is the business of the exceptant to establish by affirmative evidence where it is not self-evident in the report. It cannot appear that all the matters adverted to were in contest; and the court cannot know what may have been tacitly admitted or taken for granted. Touching the intervening interest, there is no proof either to contradict or to sustain the report; and we are to take it the auditors proceeded on sufficient grounds. In respect to the mortgages purchased of *Gibbons*, *Andrews*, and *Elliott*, there is indeed loose and indistinct testimony that they were obtained at a discount; but the auditors might well disregard it, especially as the witnesses spoke from recollection, and the entries of the transactions, referred to and admitted to be contained in their books, were not produced.

The compensation, which forms the subject of the second exception of the accountant, and the third of the trustees, seems to be a reasonable one. Though usually awarded in the form of commission, the rate is not determinable by any established practice or rule, being graduated to the responsibility incurred, the amount of the estate, and the sum of the labour expended. It may be awarded even in a gross sum, according to a common practice in the country, which I take to be the preferable one, as it necessarily leads to an examination of the nature, items, and actual extent of the services; which the adoption of a rate per cent. has a tendency to leave out of view. To adopt the same rate in all cases, would often produce a monstrous overcharge. In the case before us, the commission is rather less than five per cent. which, for the management of a fund of some forty thousand dollars, accumulated to a hundred thousand in twenty years, gives a sum to which, whatever be the operation by which it is attained, objection cannot be taken by either side, and this to compensate not only for labour expended, but for responsibility and expenses incurred in litigation.

The credits for maintenance and education, and for expenses in the voyage to England, embraced in the accountant's first exception, were properly disallowed. The whole subject was disposed of by the simple admission of the accountant's ability. It is alleged that the admission went no further than his ability to raise the means, but not without injuriously impairing his means of educating and supporting his other children. If the fact were so, it would undoubtedly make a fair exception to the rule, which requires a father *to* support his child with the father's substance. But that is not the tone of the admission as it is reported to us; and if the allegation that such was actually the fact be founded, it has not been shown to us. The expense of the voyage stands on the same footing. The purpose of it being a necessary one, and the means unattainable without recourse to the guardianship fund, or injustice to the other children,

(In the matter of Harland's accounts.)

the guardian might with propriety have applied the former without an order of maintenance.    Indeed it would seem that no authority to make such an order was lodged with any part of our judiciary, the effect of it having, at the time material to the question, been attainable indirectly, in the way pointed out in *Potts's Case, Ashm. R.* 340.    But it is well settled that chancery will allow even for past maintenance, where the father was not of competent ability. Nothing of the sort, however, is reported to have been shown to the auditors, and certainly nothing of the sort has been shown here.

The interest account is the subject of the third exception of the trustees, and of the third and fourth of the accountant.    Interest is charged on the moneys collected, or that in the opinion of the auditors ought to have been collected, allowing an average of three months for investments, instead of charging the interest actually made on principal and interest received—a process which produces compound interest, though the introduction of rests has not necessarily that effect—the propriety of which, even in the most flagrant case, seems not to be entirely settled, at least by common consent.    The subject was elaborately investigated in the matter of *M'Call's estate, Ashm. R.* 357 ; and though I concur in the propriety of the order of confirmation, I am unable to concur in the abstract conclusion of the auditor, that compound interest can be awarded under no circumstances, at least against an administrator ; and that the decree in *Schieffelin* v. *Stewart,* is not sustained by the British authorities extant when it was pronounced.    One of the latest of them, embracing the concurrent opinions of Lords Rosslyn, Eldon, and Erskine, pronounced in *Raphael* v. *Boehm,* which was elaborately argued and solemnly adjudged, twice by Lord Eldon, is direct to the point.    It is but of little account that the preceding decisions had not carried the principle so far.    It was at one time notoriously the course of the court to charge no interest in any case ; but no one would pretend that a respect for the original practice, admitted on all hands to have been unjust, ought to raise a doubt of the soundness of that which superseded it, which giving a compensation graduated sometimes to the measure of chancery interest, and sometimes to that of legal interest, according to circumstances, was founded, so far as it went, in the immutable principles of justice.    The law was in a state of progression, and the new practice was a point gained in the march of improvement.    But it was not the ultimate point ; and it is therefore not easy to apprehend how the decree in *Raphael* v. *Boehm* was an insufficient foundation for a similar decree in the state of New York, where British precedents since the declaration of independence are not prohibited.    The rule of compound interest may doubtless be thought to have been mitigated, if not abolished, in that country by subsequent decisions.    But to say nothing of the fact that these decisions were by judges of inferior degree—two of

(In the matter of Harland's accounts.)

them at the Rolls, and the other by the Vice Chancellor; and for that reason not binding on the chancellor there, yet in the last of them, where the authorities are compared, a distinction was well taken between *negligence* and *corruption*, with an intimation that a special case is necessary to induce a charge of more than four per cent., but without a direct affirmation that a special case might not be such as to warrant the allowance of more than legal interest. It was accurately said, that the omission to invest a balance which the executor was bound to put out by his general duty or the directions of the will, is negligence and not misfeasance; and that it subjects him to interest, but at the chancery rate. But what the Vice Chancellor would have said of a deliberate violation of the trust, by trading with the fund and refusing to account for the profits, is left to conjecture; and I am unable to discern in the report of the case, a sufficient reason for the interpretation of the auditor in the matter of *M'Call's estate,* that the consequence of the distinction between negligence and corruption, was supposed to be but a greater or less degree of simple interest ; or that his decision, whatever may be the current of the earlier cases, is in direct and uncompromising collision with *Schieffelin* v. *Stewart.* There is a breadth of outline in the language of the Vice Chancellor, which, while it sufficiently indicates the bent of his inclination to be against the doctrine of *Raphael* v. *Boehm,* seems purposely intended to avoid an unqualified denial of the legality of compound interest in any case. To say the least, then, the English decisions have left the question an open one.

In the United States, as in England, it is embarrassed by conflicting opinions. *Schieffelin* v. *Stewart* stands unimpeached by subsequent decision in the state of New York. It is recognized as furnishing the rule by Vice Chancellor M'Coun, in the late case of *Garniss* v. *Gardiner,* 1 *Edwards' R.* 130; and it is not impugned by *Jones* v. *De Peyster,* 2 *Wendell,* 77, which was a case of omission, and whatever the court may have thought of the doctrine in cases of corruption, not a legitimate subject of it, though more than compound interest seems to have been given in fact. In South Carolina, the legality of it in extraordinary cases, seems to be conclusively established by the court of the last resort in *Wright* v. *Wright,* 2 *M'Cord's Ch. R.* 200, and *Myers* v. *Myers, id.* 266, in which the doubts about it that had been entertained in that state, were put at rest. In Maryland, also, it is established by the highest tribunal of the state, in *Ringgold* v. *Ringgold,* 1 *Harris & Gill,* 79, and *Diffenderfer* v. *Winder,* 3 *Gill & Johns.* 345; and in Massachusetts by the Supreme Court in *Robbins* v. *Hayward,* 1 *Pickering,* 345, where the doctrine as decided in *Fay* v. *Howe, (in notis)* is recognized and assented to. In Virginia alone it seems to have been rejected. In our own state we have no decision directly on the point. *Harvey* v. *English,* 2 *Rawle,* 308, was a case of negligence, and therefore not

(In the matter of Harland's accounts.)

a subject of the rule, as were *Fox* v. *Wilcox*, 1 *Binney*, 194, and *Say* v. *Barnes*, 4 *Serg. & Rawle*, 116. The weight of American authority in favour of the rule, therefore, stands as four to one.

And why should it not be sustained on principle? It is a fundamental rule of equity that a trustee shall not make profit of the fund for himself; and the substitution of interest for profits not ascertainable, is but a modification of it. Such being the admitted basis of the rule, no colourable reason can be assigned why it should not be applied as well to an *administrator* who has used the trust moneys without having accounted for the profits, as to an executor or trustee bound by instructions, or the nature of his office to invest for accumulation. If he trade with the moneys of the fund, he shall, like any other trustee, make good the loss or render the gain; and where it is indeterminate by reason of his refusal to account, (always an index of fraud) the presumption is, that it was at least equal to simple interest for the year, and that being in his hands at the end of it, it became capital and made gain in its turn. If it were no greater in fact than simple interest for the period, he has no more to do, in order to get rid of the presumption of compound profits, than to show the truth by exhibiting the accounts. While he stands out, the presumption that he made more than the sum obtained by the method of computation employed against him, is an irresistible one, else the result would make it worth his while to disclose the truth. If he kept no accounts, he cannot murmur at the adoption of that rule of computation which is most beneficial to the fund, and but a reasonable penalty for his negligence. Interest is payable periodically; and the matter resolves itself into a question, whether a trustee may superinduce a state of things that shall give him the benefit of its earnings in prejudice of the fund. Take the case of an executor plainly bound to accumulate, who deliberately disregards his testator's directions to re-invest, and becomes a borrower from the fund at simple interest: shall not the interest as it falls due, be principal in his hands as it would have been had he received it from a stranger? In such a conjuncture it is impossible to conjecture how the fund can be rightfully left in a less prosperous condition than it would have attained, had he re-invested according to the terms of the will. To suffer a trustee to elude the conditions of the trust, by borrowing from it at simple interest, and using the proceeds for his own advantage, would offer an irresistible temptation to mal-administration by enabling him to benefit by his own wrong. That interest should not bear interest, is not a dictate of justice, but the effect, in particular cases, of arbitrary enactment founded, it is thought by some, in a questionable policy; and in a case distinctly out of the purview of the statute, where the statutory measure is arbitrarily but necessarily assumed for the computation of profits, there is no imaginable reason why the product should not be compounded where there is reason to believe that the profits were compounded; or why the

(In the matter of Harland's accounts.)

party beneficially entitled should not be put in the condition that a conscientious discharge of the trust would have put him.   In a case of negligence or omission consistent with good faith, policy dictates a more indulgent course, such as was pursued in *Harvey* v. *English,* where however the indirect influence of the statute appears to have produced the declaration, that as no man can get compound interest from his debtor in his lifetime, it is not certain that he can subject those who come after him to it.   In a case like the present, the parties certainly do not stand in the common relation of debtor and creditor.

Granting then that compound interest may be assumed as the rate of computation in extreme cases, what is the character of the case before us?   A decisive feature of it is, that there is not a particle of proof that the accountant traded with the moneys of the trust, or employed them in his business, at least without charging interest as principal; or that he refused to render fair accounts of all his transactions.   The auditors say that it was not shown that he had kept the trust moneys separate and distinct from his own; which however would make but a case of negligence.   But neither was there evidence of commixture; and whatever may have been the state of the proof before them, or the consequences of it in reference to the *onus,* it certainly has been distinctly shown here, that the moneys were regularly deposited in bank to the credit of the trust; whence they were drawn on checks for investment or re-payment of advances made to secure an advantageous purchase when the moneys on hand were insufficient to complete it.   These purchases were made in the name of the guardian; and hence an argument that the bargain was susceptible of being set down to his own account when a good one, and to the account of the ward when it proved otherwise. But the evidences of the transaction, always accessible to the ward, would show the purchase to have been made with his money, and defeat an attempted fraud by creating a resulting trust for him.   In conclusion, it is but just to say, that the estate has been managed with an uncommon degree of fidelity, care, and discretion, the fruit of which is an accumulation of it to more than twice its original amount in a period of twenty years, and without the loss of a dollar; that there has been no unnecessary delay in the business of investing; and that the omission to invest a part, was produced by a mistaken but honest belief, that the maintenance and education of the ward were to come from it.   The accounts are therefore remanded to the auditors with directions to charge the accountant with the interest actually made on sums invested, computed from the date of each investment; and with simple interest on the uninvested sums retained in his hands, computed from the receipt of each: but with no more.

                                        Ordered accordingly.