Labauvb, J.
The plaintiff obtained an order of seizure and sale upon a promissory note of the defendant, dated February 18th, 1862, for $11,000, with interest, and secured by a mortgage given by the defendant upon city property.
The defendant enjoined the sale upon the grounds that the mortgage was obtained by unlawful means, alleging that Weaver being possessed of “ Confederate notes,” issued by the Confederate States, then in insurrection, and payable as such notes were, after the termination of the existing rebellion, induced the defendant to take them, and to grant the mortgage, and to give the note and mortgage as security therefor; and that plaintiff gave defendant time for one year, ending the 18th February, 1867, to pay the note.
The plaintiff obtained a rule to set aside the injunction, upon the grounds:
1. That the first ground is not sufficient to sustain the application.
2. That the allegations of the opposition were untrue.
3. That the second ground was false, and that there was no such agreement.
The Court, after hearing the evidence, dissolved the injunction, and Thoophilus Anfoux appealed.
At the time of executing the act of mortgage by Anfoux in favor of Weaver, there existed a prior mortgage upon the property to secure a debt due by Anfoux to Ledoux, amounting in principal and interest to $8,700, evidenced by a note, of $8,000, which was held by Sosthene Armant, who appeared and intervened in the act of mortgage executed in favor of Weaver, and declared to have received payment in full of said note on that day, and cancelled the mortgage.
The first and principal question in this case is, whether or not the consideration of the note and mortgage sued upon, was treasury notes of the so-called Confederate States.
When a man, after having received the whole benefit and advantage of *13 a contract, comes in Court -with unclean hands, and alleges his own turpitude, and invokes the law of morality, to relieve himself of the execution of his part of the contract, and by that means to enrich himself at the expense of the other party, he must adduce evidence so complete that it carries with it conviction with all the power of demonstration.
In Denton v. Erwin, 6 A. 320, this Court, by its organ, Judge Eustis, said:
“ We will not give effect to an agreement entered into for an immoral and fraudulent purpose; but then such fraudulent and immoral purpose must be clearly made out, and not left to surmise or conjecture. When such a case is brought before a court of justice, the court is bound, from ásense of self-respect, to withhold its sanction and dismiss the parties; but this is in the interest of public justice, and not in the interest of the party who seeks to profit by the acts of his adversary, of which he has been the participant.”
The same doctrine is followed up in Hertz v. Wilder, 10 A. 201, when this Court said:
“ Although a due regard to the purity of justice compels the admission of allegations and proof that the form of a legal contract has been used to cover or corrupt a flagitious transaction, yet such an allegation puts the party who makes it in a position so questionable that the Judge is not only authorized, but obliged to sift with the greatest care the evidence adduced in its support, and only to give his credence when the evidence is so complete that it forces itself upon the conviction, with all the power of demonstration.”
We will now proceed to examine the evidence, and see if Anfoux has brought his case within the above doctrine, which we fully approve and adopt, notwithstanding the remark of the distinguished counsel of Anfoux in their brief, that it is unsound and in conflict with the first principles of evidence.
In the first place, there is nothing in the evidence, showing there was ever a word said about Confederate money, prior to, at the time of, or subsequent to, the passing of the act of mortgage and execution of the note sued upon.
In the second place, as regards the payment of the money—
Theodore Guyol says:
“I was a notary public in this city in 1862. The act of mortgage from Anfoux to Weaver is involved in this suit. I recognize the act shown to me. The sum of money, $11,000, less the interest, was paid me by Weaver in a check. I deposited the check to my own credit in bank; I paid $8,700, I think, to Mr. Ledoux, through his agent, Mr. Sosthene Armant, in settlement of prior mortgage; the balance I paid in a cheek, which I gave to Mr. Anfoux; I am not able to say on what bank that check was; I kept an account in the Canal, Citizens, and State Banks; think the check was on the Canal Bank; I have been for a great many years a notary public — since 1845; sums like these, I always pay in checks. I deposited the whole in bank to my credit, and then checked out to each party, as in this instance. ”
“ This act shown contains the exact agreement between the parties. I could not find the checks I spoke of. The only cheek I find is the Ledoux *14 check on the Canal Bank, and which is the exact amount of the Ledoux mortgage.”
“I did not look for the check for the balance paid to Anfoux. Weaver deposited a portion of the money with me three or four days before he deposited the balance, on the 18th February. My checks, which were drawn on bank, were payable in currency — Confederate funds. On the 19th of September, 1861, there was an agreement entered into between the bank and its depositors, that from and after that date all checks were to be paid in the same currency as was deposited.. At that time the Confederate money was currency; sometimes the banks as a favor would give in payment a few bank-notes. Weaver’s checks were ordinary checks, payable in the same currency as my checks were. If Dr. Anfoux had demanded payment of his balance in gold or silver, or even city banknotes, I could not have paid him in other funds, but in such as Mr. Weaver gave me.”
“ Checks called for no particular currency; they were ordinary checks for dollars and cents.”
On a further examination, on a new trial, he says:
“ The money which the act of mortgage calls for, was paid by Weaver in check on the bank, and the money paid by me to Anfoux was also by check on bank; the checks were in the ordinary form, calling for no particular currency.”
“These checks were deposited with me before the date of the act of mortgage. One check was delivered, I think, about eight or ten days before the signing of the act; another check was delivered a few days after the first, and the third, probably on the day of the signing of the act.”
“ I did with those checks what I always do; about three o’clock I deposited them in bank. In this matter I was acting as the notary; indeed, I was the agent of both parties. This was an ordinary mortgage ; generally the party loaning money deposits the money or check with the notary, so that if he should not be present when the act is completed, the notary will hand over the money to the other party. In my last examination, I said that I gave my check, and so I say now. ”
“The money the banks were paying at that time could have been drawn on that check — that was Confederate money; though, as I stated in my first examination, I got bank-notes when I asked for them; I considered that was a favor done to me.”
Guyol’s testimony, which we have thought proper to copy in full, and upon which turns the case, shows that Weaver, before the passing of the act, deposited in his hands $11,000 in checks in the ordinary form, calling for dollars and cents on some bank not named; that Guyol, the notary, deposited the checks to his own credit in bank; that after the passing of the act he gave a check on Canal Bank for $8,700, to pay the prior mortgage of Ledoux, and for the balance he delivered another check to Mr. Anfoux, and he cannot say on what bank, having accounts in the Citizens’ Bank, Canal Bank and State Bank; that the checks drawn by Weaver as well as those drawn by Guyol, called for no particular currency; they were ordinary checks for dollars and cents; that on the 19th September, 1861, there was an agreement entered into between the bank, which is not *15 named, and its depositors, that thereafter all checks were to be paid in same currency as was deposited; but sometimes the bank would give in payment a few bank-notes.
So far, there is nothing in this testimony establishing that one dollar has been paid in Confederate money.
But this witness, Guy ol, goes on and says: “At that time the Confederate money was currency. Weaver’s checks were ordinary checks, payable in the same currency as my checks were, and if Anfoux had demanded payment of his balance in gold or silver, or even city bank notes, I could not have paid him in other funds, but in such as Mr. Weaver gave me. ”
But all this part of the testimony, in regard to what was currency, and in what funds the checks were payable, expresses only the opinion of tho witness, and his incapacity to pay Anfoux in gold or silver, or even bank notes, does not destroy the substantial tenor of the witness’ and Weaver’s checks, which were payable on their face in no particular currency, but in dollars and cents, and Anfoux was not bound to take anything else, and he could have come back on the drawer for good money.
Nothing shows here that any part of these checks has been paid in Confederate money; to believe so it would bo surmising and conjecturing, when the law requires evidence so complete that it carries with it conviction upon the mind of the Court. Can we say, or can any one say, that Confederate money was paid on those checks? We cannot.
But it is contended that Weaver admitted in two different conversations, one with Reubieu, the other with one Scott, and it does not appear that Anfoux was present, that the mortgage had been given for Confederate money. This is the weakest species of evidence. 1 L. 285. 9 L. 562. 11 L. 139. 19 L. 547. 5 R. 330. 7 R. 112, 114. 8 A. 307. 9 A. 494.
The District Judge who heard the witnesses, paid no attention to this evidence, and in fact made no allowance to it; he must have had good reason for not doing so. If this admission was made, it was inconsiderate, for the evidence informs us that Anfoux actually received §8,700, in his own mortgage note held by Ledoux, to whose agent, Guyol, gave a check for its amount; Anfoux then received the §11,000, in his note for §8,700, and a check for §2,300.
We are of opinion that Anfoux failed to make out his caso.
The judgment is affirmed, with costs.
Rehearing refused.