# Lukens's Appeal.

It is a bad practice for guardians to settle with their wards after they come of age and take a release; they ought to settle their account in court and have it approved.

Yet if the ward receives the amount due to him and releases the guardian, he ought not to trouble him afterwards without pointing out some mistake or fraud to his prejudice, especially after a lapse of four years and other circumstances.

Notwithstanding such release, however, if the ward accepted bank-stock from the guardian at the price he gave for it, which was above its then market value, the guardian is bound to make good the difference.

It is wrong in a guardian to invest his ward's money in stock in his own name; if he does, equity would give the ward the right to the stock if it rose in value, and, if it fell, make the guardian pay with legal interest.

If a guardian trade with his ward's money, or use it so as to make compound interest, he will be charged with compound interest. So, if he be expressly directed by will, or be guilty of misfeasance or negligence; but the general rule is in favour of simple interest only.

APPEAL of Elizabeth H. Lukens from the decree of the Orphans' Court of *Montgomery* county. On the 27th August 1842, Elizabeth H. Lukens by petition to that court prayed a citation to her late guardian James Paul to settle his accounts. He answered on oath " that on or about the 17th day of April 1826 he was appointed by this court guardian of the person and estate as well of a certain Sarah Lukens as the said Elizabeth Lukens during their respective minority, and at different times received of Charles Shoemaker, executor of the estate of Joseph Lukens, grandfather of the said Elizabeth, in bank-stock, turnpike-stock, bonds and cash, amounting in the aggregate to the nominal sum of $3369.56, which made for each ward nominally $1684.78. That the said sum of $3369.56 was made up of the following items, viz. :

Cash ................................................ $2553.08
Seven shares Cheltenham and Willow Grove Turnpike stock.... 525.00
Five shares stock in the Northern Liberty Bank ............. 160.00
Jacob Schæffer's bond ..................................... 131.48

as will more fully appear by the statement hereto annexed, marked (A), and which is made a part of this answer.

That on the 19th May 1836, his ward, the said Sarah, having

attained her lawful age, your respondent accounted and settled with her, and obtained from her a full release and discharge.

That previous to respondent's making his settlement with the said Sarah, and in order to obtain funds, he gave notice to several of the debtors that he should require them to pay off their liabilities, and from the doubts expressed by some of them being able to pay he gave notice to others, so that when the time arrived for settling with Sarah, and shortly afterwards, respondent had over and above the sum due to her a sum rising $1600, which was then uninvested; and the season having passed for making investments of money in the country, and not being willing that it should remain unproductive, respondent endeavoured to invest it in mortgages or ground-rents in the city of Philadelphia, but not finding such as were satisfactory, respondent applied to William M. Walmsley, then a stock-broker in the city of Philadelphia, who on the 28th June 1836 purchased 35 shares Girard Bank stock at $61.25, and on the 1st July following 5 shares more of the same stock at $60.50, amounting together to $2446.25, for which respondent paid commissions $6.12. That at the time this investment was made respondent believed it to be a good one and for the benefit of the estate, and made in good faith. And that the dividends which he received were confirmatory of that belief, the amount of which appear in the account hereto annexed, marked (B), being the statement of his guardianship account with his ward the said Elizabeth Lukens, and by which he settled with her, and which he makes a part of this his answer.

That in November 1838, when respondent was about to settle with his ward the said Elizabeth Lukens, she being then of lawful age, having attained the same on the 4th day of the previous April, he consulted with her in relation to the Girard Bank stock, which at that time had fallen below the price paid for it, whether he should sell it or not; her orders were that it should not be sold, and she agreed to take it, viz.: 26 shares of Girard Bank stock at $61.25, 5 shares of Northern Liberty Bank stock at $32, the same price it was passed over to respondent. For 2 shares of Cheltenham and Willow Grove Turnpike stock at $85. And on the 12th day of January 1839, she being in company with her father William Lukens, Senior, who was present and acting as her friend and adviser, the same 26 shares of the Girard Bank stock at $61.25, 5 shares of the Northern Liberty Bank stock at $32, being the original cost, and 2 shares of the Cheltenham and Willow Grove Turnpike stock at $85, which stocks, together with P. Sidlinger's bond for $500 and the interest due thereon, were regularly transferred to her, and $173.82 paid her in cash, all which were received by her in full payment and satisfaction of all money and property in respondent's hands belonging to her as her guardian, and on that same day she made and executed a full and perfect release and discharge of and from the guardianship; and from all

actions, suits, payments, accounts, reckonings, claims and demands for or by reason of said guardianship; which release was executed in the presence of the said William Lukens, Senior, who signed the same as a witness, which release is made a part of this answer, and a copy thereof, marked (C), hereto annexed. That on the said 12th day of January 1839, the Cheltenham and Willow Grove Turnpike stock was worth $100 per share, and pays 8 per cent. interest; the Northern Liberty Bank stock was worth $50 per share, and the Girard Bank stock was selling for $51.50 per share, and continued at about that price for several months after the transfer.

And the respondent avers and declares that all his actings and doings as guardian of the said Elizabeth were done in good faith, and as he believed for her benefit and advantage, and with that care and caution which a prudent man under all the circumstances at the time would have done and acted, and in the same good faith having fully settled with her and accounted for everything that came into his hands as guardian, so that at this time he hath nothing belonging to her, nor hath had since the said 12th day of January 1839; and she having as he believes in the like good faith after examining his accounts, and having had reasonable time to inquire into the nature of the stocks and other things which she received, gave him a full and final release and discharge of his guardianship, and of all actions, suits, payments, accounts, reckonings, claims and demands.

And respondent alleges and says that he hath no account of the management of the property of the said Elizabeth Lukens as guardian to make, other than as set forth in this his answer, and in the account hereto annexed marked (B), above referred to, and that it is now too late for the said Elizabeth to require him to make such settlement. Wherefore the respondent shows these facts to the court for cause why he doth not file his account in the register's office according to the command of said citation, and requests that said citation may be dismissed, and that the said Elizabeth take nothing by her application, and that the respondent may be decreed his reasonable costs and expenses."

### Release.

Know all men by these presents, that I, Elizabeth Lukens, of Upper Dublin township, county of Montgomery and State of Pennsylvania, spinster, having attained my age of 21 years, do hereby acknowledge that I this day have had and received of and from James Paul, my guardian duly appointed by the Orphans' Court of the said county of Montgomery, the sum of $2781.19, in full satisfaction and payment of my full share of the estate of my grandfather, the late Joseph Lukens, of said township of Upper Dublin, deceased, principal and interest, to this date. And therefore I, the said Elizabeth Lukens, do by these presents release,

acquit and for ever discharge the said James Paul, his heirs, exe-
cutors and administrators, of and from the said guardianship, and
of and from all actions, suits, payments, accounts, reckonings,
claims and demands whatsoever, for or by reason thereof, or of
any other act, matter, cause or thing whatsoever.  In witness
whereof I have hereunto set my hand and seal, this 12th day of
January 1839.

                                           Elizabeth H. Lukens.

  Witness, &c.

  The replication of Elizabeth H. Lukens set forth " that she has
no means of knowing whether the statement made by him of the
amount alleged in his said answer to have been received by him
for her as her guardian is correct or not, and she can neither ad-
mit nor deny it.  Nor can she admit, nor has she the means of
ascertaining, whether her said guardian about the 19th May 1836
had, as he in his said answer alleges he had, collected in of her
estate more than $1600, inasmuch as he has rendered no account
of the investment of the greater part of the money of her estate,
from the time he received it till the time he alleges he called it in.
If he did so call in the money, she can perceive no reason, if it
were then safely invested, which certainly appears from the an-
swer, why it should have been called in by him.  It was not
wanted to be paid over to her, and it is not pretended that it was
paid over; why therefore it was called in by him remains entirely
unexplained, and she can see no reason why her money should
have been collected, even if money was wanted to settle with her
sister.  And in reply to so much of the said answer of her said
guardian as alleges that the season being passed for investing
money in the country, he endeavoured to invest her money on
mortgage or ground-rent in Philadelphia, and was unable to find
such as he deemed satisfactory, the said Elizabeth being ignorant
of all such matters herself, can only reply as she is advised, that
there could have been no difficulty in investing the money on
mortgage at that time, either in the country or in the city of Phi-
ladelphia.  And as to so much of the said answer as alleges that
her said guardian invested $1592 of her money for her in the
stock of the Girard Bank, and with which amount he has charged
her in his account appended to his answer, she positively denies
that it anywhere appears that such investment was made *for her*,
except in his said answer.  Your petitioner on the contrary is
informed, and verily believes she can fully prove, that all of the
said stock her said guardian bought at the time alleged by him
was bought, if bought at all, in his own name, and held by him
in his own name, for his own use and purposes, from June 1836 till
12th January 1839, more than two years and six months, when, as
the stock had fallen more than 20 per cent. and was still falling,
it was convenient for him to pass it over to her, and let her bear

the loss. If instead of depreciating 20 per cent. the said stock had advanced in value 20 per cent., the profit would have been his. She could have had no legal claim to any such advantage, as it was in his name, and no evidence whatever existed to show that it was bought with her money, or for her use. As then she could have had no claim to the profit, if any, she conceives that there is no equity in calling upon her to bear the loss, but that the attempt to do so is a fraud upon her which calls for the interposition of the equitable powers of this court.

The said Elizabeth positively and solemnly denies the allegation of the said James Paul in the said answer contained, that in November 1838 he consulted with her in relation to the Girard Bank stock, whether he should sell it or not, and that her orders were that it should not be sold, and that she agreed to take 26 shares of the said stock at $61.25. No such thing took place, either in November 1838, or at any other time. The said James Paul never consulted her in regard to either the purchase or the sale of the said stock, or of any part of it. She never gave him orders to buy it, or to sell it, or not to sell it. But she says that on the 4th July 1838 he informed her that he had bought 26 shares of Girard Bank stock, and intended to give her 10 shares of it and keep the rest himself, which is all he ever said to her on the subject of Girard Bank stock till 12th January 1839, when he alleges that a settlement was made between them. That as to the alleged settlement and the opportunity which the said James Paul avers she had to inquire into the nature of the stocks and other things which she received, the said Elizabeth saith, that she has resided all her life in the country on a farm, in the township of Upper Dublin, in the county of Montgomery. That she was up to the time of the alleged settlement, and up to the time in which she found she had worthless stocks given to her by her guardian, entirely without experience in business, and especially of money transactions and the affairs of the banks, and the investment of money. That her guardian, on the contrary, was a man much versed in business, and was then, or had very recently been, a senator in the senate of Pennsylvania, having good opportunities to obtain knowledge of the value of stocks, and to avail himself of such knowledge for his own advantage. That therefore there was no equality between them in the alleged settlement. Her guardian directed what was to be done, and it was done, and she, supposing it was fairly and rightfully done, obeyed his direction without any knowledge how he had obtained the said stock, in whose name it was invested, or of its depreciation, or of its supposed or market value. She admits it to be true, as the said James Paul in his said answer alleges, that she signed a release, as the said James Paul told her it was right for her to do so; but as to the allegation of the said James Paul in his said answer that her father was present, acting as her friend and adviser, she avers that the fact was, and that

the said James Paul well knew it, that her father, although present, was an infirm old man, both incapable and unwilling to pay any attention to the business transacting between the said James Paul and herself; and that the signature of her said father as a witness to the said release was obtained by the said James Paul with a full knowledge that he had paid no attention to what had been done, and knew nothing of the effect of the paper he had so signed.

And the said Elizabeth further saith, that by the information she has derived from the Bank, her said guardian has charged her in the account accompanying his answer with the sum of $25 as for an instalment paid by him for the Northern Liberty Bank stock, when in fact he has not made such payment. And as to so much of the said answer as alleges that all the actings and doings of the said James Paul were done in good faith, and for her benefit and advantage, and with the care and caution of a prudent man under the circumstances at the time, the said Elizabeth saith that she has at no time heretofore, nor has she now any evidence that the purchase of the said stock was intended for her at all, never having even heard that such a purchase was made by the said James Paul till it became his interest to part with it to her and others. And further she suggests to your honours whether a speculation in bank-stocks with the money of a ward, (even if that were so), in his own name, was the care and caution of a prudent man, or such care and caution as a guardian is bound to exercise. And as to so much of the said answer as avers that it is now too late for the said Elizabeth to require her said guardian to make a settlement of his accounts as such, she saith that the settlement set up by the said James Paul as a bar to her right to bring him to a settlement at this time was made by him, a man of business and of the world, perfectly aware of what he was doing, and of the advantage he was gaining in giving her stock which he had purchased in his own name, which he knew had already depreciated more than 20 per cent., and was steadily depreciating, and that this settlement now set up as a bar to her claim was made with a female just arrived at age, residing on a farm in the country, wholly unacquainted with business, entirely unaided, and dependant for information on her said guardian, and confiding in him to deal justly with her.

The facts being as in this replication is set out and averred, the truth whereof she prays may be inquired into in such a manner as to your honours shall seem fitting, she avers that neither the said settlement and release, nor any matter contained in the said answer, is any bar to prevent her from requiring her said guardian to make settlement as she prayed for in her original petition. She therefore prays the court to order and direct that the said James Paul shall file a settlement of his said accounts, in manner

VII.—E *

and form as he was cited to do, or in default thereof an attachment may be issued against him."

The rejoinder of James Paul stated " that so much of the said replication of the said Elizabeth as alleges she had no means of knowing whether the amount with which the said James had charged himself, in his settlement with her as set forth in his said answer, was correct or not, and that she could neither admit nor deny the truth of the statement, is properly answered by the fact that settlement of the accounts of Charles Shoemaker and John Thompson, executors of the last will and testament of Joseph Lukens, grandfather of the said Elizabeth, and from whom all her estate came, as well as the report of the auditors upon the said account of the said executors, were duly filed of record in the Orphans' Court of Montgomery county, and were at all proper times accessible to the said Elizabeth, and subject to her inspection and examination; and that so long as these records remain, the said Elizabeth cannot with truth declare that she had no means of knowing whether the statement made by the said James of the amount received by him for her as her guardian was correct or not. And as the fact set forth by the said James in his said answer, that on or about the 19th May 1836 the debtors of the estate of the said Elizabeth and her sister Sarah, for whom the said James was also guardian, paid in to the said James more than $1600 over and above the sum requisite to enable him to settle with the said Sarah, is not denied or contradicted by the said Elizabeth; and she the said Elizabeth having in this instance contented herself with impugning the reasons which induced the said James to notify the said debtors to pay off their liabilities, the said James does not consider it necessary to reaffirm his former statement respecting this matter, but will merely refer to the reasons therein set forth, as fully showing the grounds on which he proceeded with reference to the receipt of the money. The moneys of the two wards were for a time blended together, and in collecting an amount sufficient to pay off Sarah on her arrival at age, it so happened that a surplus of upwards of $1600, as before stated by the said James, was paid, in which the said James conceived it to be his duty immediately to reinvest, instead of keeping the same on hand and unproductive. And as to the allegation of the said Elizabeth that the said James has rendered no account of the investment of the greater part of her estate from the time he received it until he called it in, the said James says that up to the time of the settlement with the said Elizabeth, or at any reasonable time thereafter, he would, if called upon, have given her a detailed statement of the investments; but as her own moneys and those of her sister were blended together, and as the securities, consisting for the most part of bonds and notes, were often changed, and as these securities have since been given up and the moneys all collected, it is not in his power now,

after so long a time has elapsed, to furnish a detailed account of all the investments from the time the moneys were received until they were called in.  Nor can the said James perceive any reason why the said Elizabeth should desire to have any such account furnished her, as with the exception of the Girard Bank stock she does not allege any loss was sustained by the investments, or that anything was made upon them beyond what he has fully accounted for.  With regard to the Girard Bank stock, the said James again emphatically states that it was purchased by him through the broker Wm M. Walmsley for the said Elizabeth, not in her name of course, but in his own name, with the identical moneys collected in from her estate, and for her own benefit, under the sincere belief that such purchase would promote the interests of her estate; and he avers that if the said stock instead of declining gradually had advanced in value, the profit would have been exclusively hers, as was the case with the other stocks referred to in the said answer, which the said James transferred to the said Elizabeth.  And the said James further says that since the said Elizabeth persists in charging him with the loss on the Girard Bank stock, she ought at least in reason and justice to have given him credit for the increased value of the other stocks over and above the price at which he transferred them to her, so as equitably to adjust the accounts between them respecting the whole of the said stocks.  For the said James avers that the surplus value of the other stocks transferred to the said Elizabeth supplies to a great extent the loss sustained by the depreciation of the Girard Bank stock, as the following statement will show:

1839, Jan. 12—James Paul transferred to Elizabeth Lukens 7 shares of the Cheltenham and Willow Grove Turnpike stock, at $85 per share (nearly), amounting to .................................. $170
At the same time the market value of the same stock was $100 per share, amounting to ........................................ 200
————— $30

Same time transferred to her 5 shares of the stock of the Bank of the Northern Liberties, at $32 per share, amounting to ............ 160
At the same time the market value of the said stock was $50 per share, amounting to ....................................... 250
————— 90

Increased value of the said stocks over and above the amount at which the said James transferred them to the said Elizabeth .... $120
1839, Jan. 12—James Paul transferred to Elizabeth Lukens 26 shares Girard Bank stock, at $61.25 per share, amounting to .........$1592
At the same time the market value of the said stock was $51.50 per share, amounting to ..................................... 1339

Decrease in the value of the said stock below the amount at which the said James transferred it to the said Elizabeth ............. 253

And leaving a balance of loss on the Girard Bank stock, from deducting this deficiency from the surplus value of the other stocks, of  $133

[Lukens's Appeal.]

This deficiency of value in the aggregate amount of stocks at the time of the said settlement below what the estate of the said Elizabeth would have produced if invested on mortgage upon real estate at 6 per cent. by no means sustains the allegations of the said Elizabeth as to a want of care and caution on the part of the said James in making the investments. And the fact that all the loss which the said Elizabeth has sustained in these stocks, taken in the aggregate, has been occasioned by her keeping them on hand for 3 years and 7 months before making any complaint of the conduct or course of her guardian in relation to them, shows how cautious one person should be in charging another with a want of discretion in regard to the investment of money. Neither a senator of Pennsylvania, nor a girl who had lived in the country all her life, knew anything or was capable of foretelling anything in relation to the future value of any kind of securities in which money could be invested in the year 1836; all that the guardian could do was to act according to the best of his judgment, and as a careful man would with respect to his own affairs; and this the said James claims to have done. The said James, while he reaffirms all that he before said in relation to the conversation had with the said Elizabeth in November 1838 on the subject of a sale of the Girard Bank stock, positively denies that any such conversation as the said Elizabeth in her said replication represents to have taken place between them on the 4th July 1838 in regard to that matter, ever occurred either on that day or at any other time. And the said James, in reply to the remaining allegations of the said Elizabeth not hereinbefore answered, saith that the said settlement was made between him and the said Elizabeth more than nine months after her arrival at age, being after she had full notice and information of the stocks in which her moneys had been invested, and ample opportunity of making herself acquainted with their value; that the said settlement was made in presence of her own father, who was at that time by no means the infirm and imbecile old man which the said Elizabeth has in her replication represented him to be, but on the contrary was at that time and still is fully competent to transact business, and was both able and willing to pay and did pay all necessary and proper attention to the business transacting between the said James and the said Elizabeth, and signed his name to the release with a full knowledge, as the said James believes, of the effect of the paper he had so signed as a witness. That it appears from her own showing that she has resided with her said father ever since, and that the settlement remained unimpeached, and its fairness and correctness were acquiesced in, by the said Elizabeth more than 3 years and 7 months from the time it was made, and more than four years and a half after her arrival at age; and it is only after this long lapse of time that she has conceived it necessary to make this attempt to involve the said James in litigation, as though no

such settlement had ever been made. The instalment of $25 referred to in the answer of the said James was paid by him for the Northern Liberty Bank stock, as in his said answer was alleged. And that the said settlement made as aforesaid between the said James and the said Elizabeth was just, fair and correct, the said James still conscientiously believes; that in all his acts as her guardian he was governed by a sincere desire to promote her own interests, he knows. And he confides in the release which was executed to him by the said Elizabeth, with a full knowledge and understanding of the whole matter, to shield him from the wrong which now after the lapse of nearly five years is meditated against him. And he therefore again prays, as before he prayed in his said answer, that the said citation of the said Elizabeth may be dismissed, and that he be allowed his reasonable costs and expenses."

Several depositions were taken in the court below as to the sickness and want of capacity of the plaintiff's father, and his incompetency to advise his daughter, and also as to the market prices of stocks.

BURNSIDE (President) gave the following opinion and decree:

"On the 17th August 1842 the court granted a citation to James Paul, returnable the first day of the next term, to settle his account on 21st November 1842. Paul filed his answer to this citation, showing that he had settled with his ward Elizabeth Lukens after she came of age. On the 20th January 1839 a full settlement was made, and a release and discharge delivered to the guardian. Paul was also guardian for Sarah Lukens, who came of age in 1836, and in that year had called in money for her settlement. He alleges in his answer that he had a surplus of $1600 on hand, and that the season having passed for making investments in the country, he on the 28th June 1836 purchased stock in the Girard Bank at $61.25, and on the 1st July following 5 shares at $60.50, amounting together to $2546.25. When the parties settled in January 1839, Elizabeth Lukens having become of age the April preceding, the stock had fallen to $51, and she accepted and received 26 shares at $61.25, amounting to $1592. Other stocks were transferred to her at that time at the price they cost, which were then of more value. On looking carefully into the pleadings and the evidence, and the situation of the guardian, who is a farmer not engaged in other business so far as we know, we are satisfied that it was the money of his ward which he invested in June 1836 in the Girard stock, and in making that investment he acted in good faith.

The ward accepting the stock at $61.25 when it was only worth $51, is the material ground of complaint; there is no other specific error in the account shown. Perhaps it would have been better to have compelled all guardians to settle in conformity with the letter of the statutes; but after the case of *Ex parte Cress*, (2 *Whart.* 497),

VII. — 8

and other decisions of the Supreme Court, and the long practice which has existed of allowing settlements between guardians and their wards after they have become of age, when there is no specific error pointed out, it would ill become this court to unsettle the practice. It will be for the Legislature by further enactment, or the Supreme Court, now to say that all must settle in the Orphans' Court. Here the ward had been of age 8 months. The settlement is made in the presence of her father, but that circumstance under the evidence is not deemed very material by the court. She takes the stock at the price the guardian paid for it, and no complaint is made for 3 years and 8 months, when the stock is greatly deteriorated in value. This case then presents a case of immense importance to all guardians. This stock was purchased after the Girard Bank had received an increase of her capital, and at a time when the whole country were running mad after stocks of every description. Regarding the decisions which have been made, and being unable to see any fraud or imposition in the case, or that the guardian has made anything by the transaction, we dismiss the application—each party to pay their own costs."

Error assigned:

The court erred in dismissing the application of the complainant.

*Dallas* and *J. Fox*, for the appellant.

We asked an account, and that is all we asked. The court say the settlement bars it. A settlement soon after coming of age between the guardian and ward, before the ward is acquainted with his affairs, is always looked at with jealousy, *Elliot* v. *Elliot*, (5 *Binn.* 8); *Say's Ex'rs* v. *Barnes*, (4 *Serg. & Rawle* 114); *Nyce's Estate*, (5 *Watts & Serg.* 254); and the account is re-examined. The case *Ex parte Cress* (2 *Whart.* 497) was different. The circumstances mentioned by Huston, J. as exceptions are embraced in the present case. This settlement was not in the presence of friends, no account or vouchers were furnished, and there is error apparent in not giving the proper credit. In the year 1826 the respondent was made guardian, and for ten years the property was well invested. In 1836, two years before the ward came of age, he called in nearly all her share. Why do this? He had but $1600 of her money, yet bought more than $800 worth besides. He must have mingled her money with his own. He is bound to show what money he called in, and how he invested her money, whether for her or his own purposes.

For the appellee there was no argument.

The opinion of the Court was delivered by

Kennedy, J. — Elizabeth Lukens, the appellant, who was the complainant in the Orphans' Court, and had been during the latter

part of her minority the ward of the respondent in this case, attained full age on the 4th April 1838, and on the 12th January 1839 received from him the amount of what he represented to be in his hands and then held as her guardian, and thereupon signed a release or an acquittance in his favour. This was done in the presence of her father; but it is said that he was rendered incapable at the time, by previous sickness, of advising or directing her in the matter, and of deciding whether all appeared to be right or not. It would appear, however, that no objection was then made to the amount of the moneys and the nature of the property, which the defendant represented he had received and held as belonging to the complainant, and actually paid and passed over to her. Nor has it been attempted to be proved or shown that his representation in regard thereto was in any particular untrue. The amount as well as the nature of the funds which he received as her guardian is stated in his answer, together with the amount of their accumulation under his care and management until he paid over and passed the same to her, some nine months after she attained full age. But it is required of him to state fully and particularly, and to give in detail an account of his administration of the funds belonging to the complainant during the time of his guardianship, showing from time to time, as the same came to his hands, what he did with them, and the profit that he thereby made on them; and again how such profit was disposed of, so that a further profit should appear to have been made thereon. This, however, he declares by his answer on oath that he is now unable to do after so great a lapse of time, as the securities upon which the trust moneys were let out have long since been all paid and given up by him, without his having made and preserved any memorandum thereof in writing.

We have reason to believe that it is the practice of guardians frequently to settle with their wards, after the latter have attained full age, without stating and settling their accounts in the Orphans' Courts, and to take of them receipts in full or releases. Such practice, I would suggest, had better be avoided; for it is obvious, if a settlement were first made by a guardian of his account in the proper Orphans' Court, upon due notice given to his ward, so as to obtain the approval and sanction of the court, it would tend to promote the interest of the ward and the security at least of the guardian, and at the same time to prevent subsequent litigation, expense and trouble. The ward, under the express provisions of the Act of Assembly, has a right to require that such settlement shall be made by his guardian before the court; but if he chooses, after he has arrived at full age, to make a settlement with his guardian, without the intervention of the court, and, after having received the amount agreed to be coming to him, to give an acquittance or release to his guardian, he ought not to trouble the court or his guardian either afterwards, without

pointing out some mistake or error in the settlement, or showing that a fraud has been practised on him by his guardian, whereby he is prejudiced. But more especially shall he not be allowed to call his guardian to account before the court after a lapse of nearly four years, as in this case, without pointing out or designating some mistake, or specifying a fraud alleged to have been committed, and undertaking to prove the same in some way. But suppose in this case that the complainant, before settling with and releasing the defendant, had cited him to appear in the Orphans' Court and settle his account, and that he had filed an answer stating all the facts set out by him in his answer here, showing what he received belonging to her, when received, what it consisted of, and the increase on the same, together with the aggregate amount which then remained in his hands, and that he was unable to give a more detailed account of his administration, as he had given up all the bonds and securities taken by him from time to time as he lent out the moneys of the complainant to divers persons, and had no written memorandum of his doings in this respect from which he could make his account more perfect or full than stated in his answer; what would the court have done? It certainly would not have attempted to have enforced, by means of an attachment, from the defendant a statement which he had testified on oath he was unable to make. In such case, when, for aught that appeared to the contrary, the defendant had stated correctly all that had ever come to his hands or knowledge as guardian, and the profit made thereon, which appeared to be reasonable, the court would have approved and confirmed the account as stated by him in his answer, with the exception, perhaps, as to that portion of it which had been vested by the defendant in the stock of the Girard Bank, which the court might have said must be accounted for or paid in money, unless the complainant were willing to take the stock at the then market value, but not more; and if the complainant had been willing to do this latter, the court surely would not have interposed to prevent her doing so; and having done it, she would have been bound thereby afterwards, notwithstanding the subsequent great depreciation in the market price of the stock.

But seeing the complainant took the stock at nearly 10 per cent. above the market price at the time, which the court would not have compelled her to do, and that the defendant had no authority from the court to invest her moneys in such stock, it would seem right, especially when we take into consideration her want of experience in the nature and the liability of such property to change in value, so as to become sometimes even worthless, that the defendant should make good to the complainant the difference between what she took the stock at and the market value of it at the time of the transfer of it to her. It is pretty evident that the great fall which has taken place in the market price of this stock

since it was transferred to the complainant, has been the sole and only cause of her application to the Orphans' Court against the defendant for a statement and settlement of his guardianship account.   If the stock had not fallen, or had risen in value, there is every reason to believe that she would have remained perfectly satisfied with the account which the defendant had rendered, and what he had given her.   In the first place, the great lapse of time which took place before she made any complaint goes to show this.   And although it may be that her father, from sickness at the time she made the settlement, was not very capable of advising her for the best, yet in a very short time afterwards he was restored to his usual health, and when in that state the testimony on the part of the complainant herself shows that he was quite a man of business, so that if there had been any other ground for complaint it would have been heard of.   But what seems to show conclusively that the great depreciation in the market value of the stock of the Girard Bank was the only cause of dissatisfaction on the part of the complainant afterwards, is the settlement made two years previously with her sister Sarah, when the father was in perfect health, and capable of advising and seeing that all was' right, to whom the same amount of principal and interest made. thereon up to that time was rendered by the defendant, and the amount thereof paid to her in money instead of. stock, as no purchase had been made then of stock with the moneys of either, against which no exception or even murmur of complaint has ever been made.

The most exceptionable feature in the conduct of the defendant as disclosed by his answer, is the circumstance of his having invested the moneys of the complainant, when in his hands, in the stock of the Girard Bank in his own name, and not in that of his ward.   This was wrong and ought not to be; for it may enable the guardian, if the stock should rise greatly in value, to claim and hold it as his own, but if it happens to fall in price he may then endeavour to throw the loss on his ward, by showing that he purchased the stock with the funds of his ward.   Equity and courts too, I take it, would hold the guardian bound to transfer the stock to his ward whenever, in such case, it has risen in value so as to make it for the benefit of the ward to do so; but where it has fallen in value, and a loss would accrue to the ward by having it imposed on him, courts, from considerations of policy, with a view to prevent a guardian from making profit and gain of his ward's moneys or funds without its being made known by him, as far as practicable, so that he may be readily made to account for the same, will never hold the ward bound to accept of a transfer thereof, but will on the contrary decree the money so invested in stock to be paid or accounted for by the guardian with legal interest.   But there is reason to believe that guardians frequently purchase stock in their own names with the moneys of their

[Lukens's Appeal.]

wards, intending it honestly at the time for their exclusive benefit; so that it would be going too far to consider it *per se* such evidence of fraud as shall be deemed sufficient to set aside the settlement made by the ward with his guardian, without other circumstances being shown from which it may be inferred that the ward has not been fairly dealt with. If it appeared in this case that the defendant had traded with the moneys of the complainant, or used them for his own purposes in any way, whereby, for aught that appeared to the contrary, he had made gain or profit of the same equal to compound interest, and he had refused to render an account thereof, he would, as it appears to me, have been justly and legally chargeable with compound interest, and the court below would have been bound to have directed him to be charged therewith accordingly. *Schieffelin* v. *Stewart*, (1 *Johns. Ch. Rep.* 620). See *Ex parte Baker*, (18 *Vez.* 246); *Stackpoole* v. *Stackpoole*, (4 *Dow P. C.* 209); *Harland's Accounts*, (5 *Rawle* 323); *Wright* v. *Wright*, (2 *M'Cord's Ch. R.* 185); *Ringgold* v. *Ringgold*, (1 *Harr. & Gill* 11). This is one of the few cases in which compound interest may with propriety be charged. But certainly the general rule seems to be in favour of simple interest merely. So it may be right to charge compound interest where a guardian or a trustee is directed by the will of the testator creating the trust to place the trust funds at interest, to be paid thereon semi-annually or annually at most, and upon the receipt of such interest to put it again to interest in like manner, &c. In this latter case it may well be said that the guardian or trustee, by accepting the guardianship or trusteeship, has undertaken to do as directed by the will, which is in effect, if practicable, to make the trust money or fund produce compound interest; but having wilfully failed to do so, when practicable, he becomes fairly liable according to his special undertaking to make good the loss arising from the breach of his undertaking, or in other words to pay the amount of *the* profits which might have been derived from the trust fund had he done his duty. *Raphael* v. *Boehm*, (11 *Vez.* 92); 13 *Ib.* 407, 590; 2 *Kent's Com.* 231, *note* (b). And it may also be, if a person acting in a fiduciary character shall be guilty of misfeasance instead of negligence merely, that he may be charged with compound interest, because misfeasance, when committed to the prejudice of another, is such a wilful and determined wrong as would seem to require greater severity of punishment than mere neglect of duty, though the neglect be of a gross nature. See *Tebbs* v. *Carpenter*, (1 *Madd. Ch. Rep.* 290).

Upon a full and deliberate consideration of this case, we are of opinion that the defendant ought to be charged with the difference between the market value of the Girard Bank stock at the time he transferred it to the complainant, and the value or price at which it was transferred to her; and that he ought to pay this difference, amounting to $253, with interest thereon from the 12th

[Lukens's Appeal.]

of January 1839, to her, beside the costs of this proceeding. The decree of the Orphans' Court is therefore reversed so far as it is inconsistent with the opinion thus expressed, and affirmed as to the residue.

Ordered and decreed that James Paul, the appellee, pay to Elizabeth Lukens, the appellant, the sum of $253, with interest thereon, from the 12th day of January 1839, the same being the difference between the price at which the stock of the Girard Bank was transferred and given by the appellee to the appellant, and the market price thereof at the time of the transfer; and further, that the said James pay the costs of the proceedings in this case, and that the decree of the Orphans' Court is reversed so far as it is inconsistent with the decree of this court.