# Lewis and Parker *versus* Browning and Wife.

1. The jurisdiction of the Orphans' Court over all matters of account between guardian and ward is exclusive.

2. Although a guardian may have made a private settlement with his ward, on his arriving at age, he may still in a proper case, within a reasonable time, be required to file and settle his account in the Orphans' Court. If, however, such settlement shall have been made in good faith and on full deliberation, is full and fair, is accompanied by a full release executed under no mistake or misapprehension, and has been acquiesced in by the parties, it may be treated as a waiver of the legal right to an account in the Orphans' Court, and its terms may be enforced in the Common Pleas as other contracts are enforced.

3. A ward cannot impeach such a settlement and release, as having been procured by artifice, misrepresentation and fraud, in an action in the Common Pleas against those with whom his money has been invested by his guardian. If the settlement and release is repudiated, resort must be had to the Orphans' Court.

4. Equity would compel the use of the guardian's name for the benefit of his ward in an action instituted by him against those with whom the guardian had invested his money.

January 12th, 1886.    Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.   PAXSON, J., absent.

ERROR to the Court of Common Pleas No. 3, of *Philadelphia county :*  Of January Term, 1885, No. 207.

Assumpsit by Walter C. Browning and Emily L. Browning, his wife, in right of said wife against J. William Lewis and Martin E. Parker, brought 28th of March, 1882.   The *narr* contained only the common counts.   In the bill of particulars plaintiff claimed, in addition to the sum of $4,266 received by defendants from Emily H. Parker, for which sum a remittitur was afterwards entered, the sum of $5,982.07, " received by the defendant for her use from J. William Lewis, late guardian of her estate."   The pleas were *non assumpsit, non assumpsit infra sex annos,* payment with leave, etc.

On the trial of the case the following facts appeared :   In 1869, J. William Lewis, the plaintiff in error, was appointed, by the Orphans' Court of Delaware county, guardian of the estate of his niece, Emily Lownes.   The latter was the daughter of his sister Emily, by her former husband, Phineas Lownes, who died in the year 1856.   Lewis was in partnership with Lownes at the time of the decease of the latter. After the death of the latter, his capital had been continued in the concern by his widow, who was his executrix and sole legatee, until the year 1867, when she dissolved the partnership, which was re-formed between her brother and her second husband, M. E. Parker, to whom she transferred $35,000 out of her capital, which he contributed as his share of the capital of the new concern.   The business was carried on under the firm name of Lewis & Parker until the 31st day of December, 1877.   At that time Parker retired, and his interest was ascertained to be some $41,000, for which notes were given.   The business has ever since been carried on by J. William Lewis individually.   Prior to the bringing of the present suit all these moneys, together with some $24,000 additional, had been paid by Lewis to Parker.

In the year 1878 or 1879, Emily Lownes married Walter C. Browning.   Later in the year 1879, M. E. Parker entered into the patent medicine business with said Browning, which was continued until the year 1881, when it was dissolved.   It proved very unfortunate, and caused the insolvency of Parker. As guardian of said Emily, Lewis collected some $4,800 from the estates of her deceased grandfather and uncle.   This amount, in January, 1877, by reason of an allowance of seven per cent. interest, of the compounding of interest and of the non-charge of commissions, had increased to $5,982.07.   These

moneys, from time to time, were deposited with the firm of Lewis & Parker, by said Lewis. An account was opened with him, headed " J. William Lewis, Guardian," in which were entered the sums as they were received, and the interest and compound interest thereon.

On the 31st day of December, 1876, this account was balanced on the books of Lewis & Parker by a debit, " December 31st, 1876 ; cash M. E. Parker (46), $5,982.07." On the 1st day of January, 1877, this amount was carried to the credit of M. E. Parker's private account on said books, and continued to his credit until the time of the dissolution of the firm, when it was settled for by Lewis, by giving him notes and other obligations therefor, which were all paid before this suit was brought.

Miss Lownes came of age on the 3d day of July, 1876. On that day the mother made her a gift of $4,226, out of the sum owing to her by her husband, which she had loaned to him in 1867, to make up his contribution to the firm of Lewis & Parker. It was claimed by the defendants that on that day Parker had given his note for this amount to Mrs. Browning. This she denied. A note was given to Miss Lownes in the following form :

" $10,000.                         *Chester, Pa.,* Jan. 3, 1876.

Six years after date I promise to pay to the order of Emily L. Lownes, at the Delaware County National Bank, ten thousand $\frac{}{100}$ dollars, without defalcation, value received, with interest at six per cent.

" M. E. PARKER."

Defendants claimed that the date had been mistakenly written 1876 when it should have been 1877, in the early part of which year Parker said it had been given. Mrs. Browning denied this, and claimed that it had been given to her on the 3d day of January, 1876. This note included the said $4,226 and the $5,982.07, less a small sum which had been paid to her to reduce the debt to the even amount of $10,000. This note was handed to her, and was put by her in a fire-proof, to which she had access, in the house of her stepfather, where she resided.

In March, 1878, as she admitted, it was removed from said safe, and has ever thereafter remained in her possession. After her marriage, as before, she and her husband continued to live with her stepfather till the misunderstanding arose consequent upon the failure of said patent medicine business. In 1881 they moved away, and shortly thereafter legal proceedings were begun against the stepfather alone, to recover the amount of said note. On said note was indorsed, all in her

own handwriting:   "Received interest in full to August 3d, 1877.  Emily L. Lownes."   Interest was paid by M. E. Parker from time to time, some as late as in 1882, in full to 3d October, 1881.   They were all given to "M. E. Parker," and were expressed to be "on account of interest," or "in full for interest."   On one occasion after the breach, namely, on the 6th day of January, 1882, a letter was written by Mrs. Browning to her mother, stating an account of the balance of interest due, and asking for its payment.

The guardian never settled his account with his ward in court ; but an account was offered in evidence of his receipts and disbursements, which showed a balance of $5,982.07 to be due by him.   A release, dated 24th January, 1877, duly acknowledged before a notary public, and duly recorded on the same day in the office of Recorder of Deeds for Delaware County, was produced, which was written at the foot of said account.   It was in these words :

"Know all men by these presents, that I, Emily L. Lownes, the above mentioned minor, being now of full age, hereby certify that I have examined the above account of my guardian, J. William Lewis, and am fully satisfied therewith; that I am cognizant of the receipts and expenditures, and that I have received from the said J. William Lewis the full amount of the balances in said account named, to wit, the sum of $5,982\frac{7}{100}$, in consideration of which I hereby for myself, my heirs, my executors and administrators hereby release and discharge the said J. William Lewis, his heirs, executors and administrators of, and from all and every claim, action and demand, or account for or on account of his said guardianship, or any matter or thing connected therewith.

Witness my hand and seal this 24th day of January, A. D. 1877.

| Witnesses, | (Signed,) |
|---|---|
| EMILY L. PARKER, ⎱<br>J. B. HANNUM, ⎰ | EMILY L. LOWNES." |

```
×××××××
×   L   ×
×       ×
× SEAL  ×
×       ×
×   S   ×
×××××××
```

On behalf of the defendants, it was testified that after Miss Lownes came of age, she was told by her mother that her uncle wished to be discharged from the care of her money, and that her stepfather had taken charge of it and would be responsible for it ; that later she had also been told that her uncle wished her to release him ; that she had gone to the office of Mr. Hinkson in pursuance of an understanding with

her that he should be released; that at the office of the latter the account had been presented and the release had been written; that after it had been written it had been read to her, and had been approved of by her.

There was no testimony as to Mr. Lewis having ever been liable in any way for the $4,226, saving what was said by Browning:

"He (Parker) spoke of Miss Lownes' (now my wife) money; how her father's money had been left to her; that it was with the firm of Lewis & Parker; had drawn 6 and 7 per cent. It amounted to $10,000 through the care they had taken of it. He said to me in 1877 that the money had been left with Lewis & Parker, and had reached $10,000 owing to their management."

There was no proof that demand was made upon Lewis for any part of the $10,000 until the bringing of the present suit in March, 1882. In December, 1881, a suit was brought by the plaintiffs against Martin E. Parker for the recovery of this money, and judgment for the whole amount thereof was entered against him. Mrs. Browning filed an affidavit of loan on the 21st day of December, 1881, *inter alia* as follows:

"The demand in the said cause of the said Emily L. Browning is for moneys advanced to the defendant, which said moneys were and are the proper moneys of the said Emily L. Browning, payable to her by the said defendant on demand, and amounting to the sum of $10,000, with interest from the 3d day of October, A. D. 1881, and the demand for the payment of the same has been duly made by the said Emily L. Browning of the said defendant; he has neglected and refused to pay the same, and still does so neglect and refuse."

The defendant submitted *inter alia* the following points for charge:

6. If you find that as guardian of the plaintiff Lewis had in his possession the $5,982.07; that before she came of age he had made the loan of this sum to the firm in his own name as guardian; that the firm never undertook with the plaintiff in her own right to pay her this sum, your verdict for that part of her claim must be in favor of the defendants. Refused. (Second assignment of error.)

7. As to so much of the plaintiff's claim as concerns the demand for said $5,982.07, your verdict must be for the defendants. Refused. (Third assignment of error.)

The court instructed the jury *inter alia* as follows in the general charge:

It is now for you to say whether at that time there was any change made in the liability of Mr. Lewis by the act of Miss Lownes, the present plaintiff, Mrs. Browning. She did re-

lease him. She admits that she did sign a release releasing him from all liability as guardian, and I hold that that release is sufficient to discharge this obligation as far as any guardian money is concerned. Now I leave out of view the $4,200, if there was any liability for that in this action or any other action so far as that money is concerned. Unless there was an agreement by which he was to become liable in some other way. [It not only discharged him as guardian, but it discharged him from all responsibility for that sum of money, provided there are no other circumstances vitiating that release, and that release cannot be vitiated or set aside unless there are some circumstances of fraud or unfairness about it. If Mr. Lewis had imposed upon her, had got her to sign the release not knowing what she signed, had used fraud or deception it might not be good, or if there was any fraud practiced upon her,] but it is now for you to consider as to whether she deliberately signed that release. What was her understanding at the time? I do not think that in her testimony she throws any light upon what her thought was as to what she was doing at the time she signed it. She said she signed the release. She said she was requested the day before by her mother, and I think she admits that Mr. Lewis came there the night before, to get her to go to Chester in the morning, and to sign his release as guardian. I do not think she testified as to any understanding of hers at that time of what responsibility still remained upon her uncle. It is, however, for you to consider whether there are any circumstances showing fraud in the obtaining of that release. She denied any knowledge of the substituting of Mr. Parker for her debtor instead of Mr. Lewis. If Mr. Lewis at that time had been a party to any arrangement by which a worthless man had been substituted for himself, she being just arrived at age, and a release obtained under such circumstances it would not avail Mr. Lewis now. But was that the fact of the case? Was she imposed upon and was a worthless debtor substituted for a man who was solvent? You have heard the testimony in regard to Mr. Parker's circumstances at that time, and as to his circumstances for years afterwards. You have also heard the family relations that then existed between them. As to her knowledge of what was done, you have her receipts of interest. Whether her explanation satisfies you that she did not know whether she signed for interest or not, I do not know. You have also the testimony of her sister that she spoke about her father having the money in 1881, and the testimony of her brother that she spoke of her father having the money in 1879, and you have also the admitted fact by herself that she did receive a note from her father in

1874 or 1875, and a note afterwards in 1876. Why she should have received that note from her father and not from Mr. Lewis, if she still held Mr. Lewis, is a fact for you to consider, and whether it is possible for her to have held the note of Mr. Parker for so many years and not have examined it or not have known whose note it was is another fact for you to consider. You are also to remember that she brought suit against Mr. Parker. She made an affidavit in that suit. The effect of bringing that suit against Mr. Parker is for you to consider. If under all these facts you come to the conclusion that she deliberately accepted Mr. Parker in lieu of Mr. Lewis as to the $5,900, and in lieu of the firm as to the $4,200, provided you find that the firm ever agreed to pay that money, or Mr. Lewis, then she cannot recover in this action. [If, upon the other hand you find that she was deceived, that this release was obtained from her by fraud;] that she never knew of the substitution of Mr. Parker, then she can recover as to the $5,900, and can recover as to the $4,200, if you find that Mr. Lewis knew and agreed that the firm should pay the money.

Verdict for the plaintiff for $10,638,33. The court was of the opinion that there had been no evidence whatever to justify the verdict as to the said $4,226, part of the sum, and ordered a new trial unless that part of the verdict was remitted. A remittitur was thereupon filed. Upon judgment being entered the defendants took this writ, assigning for error the refusal of their points, and that part of the general charge included within brackets.

*John G. Johnson (John M. Broomall* with him), for plaintiff in error.—It is well settled that it is error in law to submit to a jury facts to be found by them, in the absence of evidence of the truth of such facts.

1. There was no evidence that the release had been obtained by fraud, or that Lewis had imposed upon his ward; or that he had got her to sign, not knowing what she had signed, or that he had used fraud or deception, or that he had practiced any fraud upon her.

2. The contract between Lewis & Parker was with "J. William Lewis, Guardian," by whom the money had been deposited, and there was no right in the ward to sue thereon.

1st. The suit should have been brought in the name of J. William Lewis. There was no right at law to sue in the name of the ward: 1 Chitty's Pleadings, 2; Finney *v.* Finney, 4 Harris, 383; Treat *v.* Stanton, 14 Conn., 445; Pond *v.* Curtiss, 7 Wend., 45.

2d. Equity would not have compelled the guardian to permit the use of his name by the ward.

(*a*) Because the jurisdiction of the subject matter was exclusively in the Orphans' Court: Act of 16th June, 1836; Act of 29th March, 1832, § 10; Carl *v.* Wonder, 5 Watts, 97; Shollenberger's Appeal, 9 Harris, 341; Bowman *v.* Herr, 1 P. & W., 282; Denison *v.* Cornwell, 17 S. & R., 378; Morris *v.* Garrison, 3 Casey, 226; Welker *v.* Welker, 3 P. & W., 25; Raser *v.* Raser, 12 P. F. S., 436; Slaymaker *v.* Farmers Bank, 7 Out., 616; Brookes' Appeal, 6 Id., 150.

(*b*) Equity would not compel the guardian to permit the use of his name in a suit to recover the deposit, because of the existence of the release.

If this release had been pleaded in answer to a bill filed to compel the use of the name of the guardian in a suit against J. William Lewis, it would have had the weight of two witnesses. It was not overborne by one, much less by two, witnesses. She swore to no circumstances of fraud, or deceit. No chancellor would have granted her relief under the testimony in this cause, and if the court is willing to treat the record as amended, to such extent as a court of equity would compel, it will not do what a chancellor would not do, under an answer to a bill not overborne by two witnesses.

3. There was no evidence to sustain the verdict. The settlement in this case was a family settlement, and as such was favored. As was strongly said in Bierer's Appeal, 11 Norris, 266, where there was an attempt to impeach a widow's release: " To succeed in this, the evidence of the fraud should be clear, precise and indubitable."

Before the ward could escape from the bar of her release it would be necessary for her to make specific charges of fraud, and to sustain them by clear proof: Cummins *v.* Hurlbutt, 11 Norris, 166; Greenfield's Estate, 12 Harris, 232; Pennsylvania R. R. Co. *v.* Shay, 1 Norris, 198; Marr's Appeal, 28 P. F. S., 66; Marten's Appeal, 13 W. N. C., 289; Weller's Appeal, 7 Out., 597.

*William W. Wiltbank* (*Henry Reed* with him), for defendant in error.—1. The court did not err in stating the law as to the effect of the release. It will be observed that the release of the guardian did not bear an important part in the inquiry. It was not an essential aid, whether obtained fairly or otherwise, as it could not operate in this action as a defence. It was introduced by the defendants, but was only pertinent in the development of the history of the girl's fortune, for it made no difference here whether Lewis was released or not. Mrs. Browning was identifying and following her money after it had left her late guardian. She had, therefore, in one sense, accepted his account and investment of it, and thus had gone

beyond him and made demand of the real debtor, just as she would have done had he put the money out on mortgage and then terminated his trust. The assets being turned over to her, she might have sued the mortgagor. Indeed, that she was at a stage beyond, and in consequence of, the release is the view of the plaintiffs in error, who claim that, as no evidence of obligation was assigned to her, she should have sued the firm through her guardian in the Orphans' Court.

The doctrine that the subject matter of a guardianship is exclusively for the Orphans' Court has no place here. The guardian is not being sued; nor are assets out of which he could claim commission diverted from him. He has stated an account, shown a balance, and declared that in the first instance he loaned the fund to the firm. He cannot now ask for a re-accounting in the Orphans' Court. He has voluntarily forgone that protection, and bound himself by his own figures. He has determined precisely to what extent he owed his ward. He relies on his release. Nor is he attacked here as guardian. It is not that the ward wants to know the amount of her estate, to charge him with it. For the purposes of this case she has acted upon his accounting, has followed the fund to the firm, has shown the firm's knowledge that it is hers, and demands it direct of them. A *cestui que trust* may do this. A *fortiori* may a claimant in Mrs. Browning's position. "The true owner of money traced to the possession of another has a right to have it restored—not because it is a debt, but because it is his money. His right is incidental to his ownership; and whether the money is traced to the hands of a single individual or to the hands of a firm is wholly immaterial:" Lindley on Partnerships, 250, Am. ed., 1860; Lee v. Gibbon, 14 S. & R., 111; Hutchinson v. Smith, 7 Paige, 26; Collinson v. Lister, 20 Beav., 356; Welker v. Wallace, 31 Ga., 362.

The suit was properly brought in the name of Mrs. Browning: Geddis v. Irvine, 5 Barr, 508; Guillou v. Peterson, 8 Norris, 163.

Mr. Justice CLARK delivered the opinion of the court, February 15th, 1886.

In the year 1869, J. William Lewis, one of the defendants, was appointed guardian of Emily L. Lownes, (now Emily L. Browning) by the Orphans' Court of Delaware County. At this time, Lewis was a partner of one Martin E. Parker, the stepfather of Emily, in some mercantile business in Delaware County, doing business under the name of Lewis & Parker. The moneys which Lewis received in behalf of his ward, he invested with Lewis & Parker; the several sums received, and

thus invested with the interest thereon, having been, from time to time, entered to the credit of the guardian, in an account opened on the books of the firm, in the name of J. William Lewis, guardian, &c. The ward arrived at the age of twenty-one years on the 3d July, 1876, and on the 30th December, 1876, the whole investment, with the interest as it appeared upon the books, amounting to $5,982.07, was, by the guardian, transferred to Martin E. Parker, who, as between himself and the guardian at least, assumed the responsibility thereof.

The guardian did not file any account in the Register's office, as required by law, but on or about the 24th of January, 1877, prepared a statement of his receipts and disbursements, and submitted the same to his late ward for her approval. This statement exhibited a balance due the ward of $5,982.07, as above stated. At the foot of the statement was written a release, in the following form, viz:

"Know all men by these presents, that I, Emily L. Lownes, the above mentioned minor, being now of full age, hereby certify that I have examined the above account of my guardian, J. Wm. Lewis, and am fully satisfied therewith; that I am cognizant of the receipts and expenditures, and that I have received from the said J. Wm. Lewis the full amount of the balances in said account named, to wit, the sum of five thousand nine hundred and eighty-two dollars and seven cents, in consideration of which I hereby for myself, my heirs, my executors and administrators hereby release and discharge the said J. Wm. Lewis, his heirs, executors and administrators of, and from all and every claim, action and demand, or account for or on account of his said guardianship, or any matter or thing connected therewith. Witness," &c.

This release, on the day of the date thereof, was signed by Emily L. Lownes, in the presence of witnesses, was by her duly acknowledged before a Notary Public, and was delivered to Lewis, who afterwards caused it to be recorded. No money was paid to Emily L. Lownes at the time of the execution of this release; the interest subsequently accruing, up to the year 1882, was paid to her by Martin E. Parker, sometimes in the checks of the firm of Lewis & Parker, and sometimes otherwise; in all cases, however, after her arrival at age the interest was paid and the receipts were written to Martin E. Parker, individually.

It also appears that the ward was entitled to an estate of $4,226, a gift from her mother, made at or some time before her arrival at age; this fund, however, it appears, was in the hands of Martin E. Parker, and never reached the custody of Lewis, the guardian. On the 30th December, 1876, therefore,

the entire estate of Emily L. Lownes, consisting of the two funds mentioned, and amounting to $10,000 and upwards, was transferred to the custody and control of Martin E. Parker, her stepfather; the first fund, $5,982.07, by the act of her guardian, and the second fund, $4,226, by the act of her mother, who gave it to her. The fund of $5,982.07, however, remained invested with Lewis & Parker, whilst the $4,226; it seems, constituted part of Parker's capital in the business.

On the 31st December, 1877, the firm of Lewis & Parker was dissolved, Martin E. Parker retiring from the firm; the interest of the retiring partner was ascertained to be $41,000, which included the moneys of Emily L. Lownes, and this sum was subsequently, and before the bringing of this suit, fully paid by Lewis to Parker. In the year 1878, Emily L. Lownes became the wife of W. Champion Browning, and Parker entered into a co-partnership with Browning, which, proving unfortunate, he some time afterwards became insolvent.

On the 21st December, 1881, Emily L. Browning brought suit against Parker, in the Court of Common Pleas No. 1 of Philadelphia County, on a promissory note which she then held against him, dated 3d January, 1876, payable to her order six years after date, for ten thousand dollars, with interest at six per cent. There was some evidence to show that the note was given and should have been dated 3d January, 1877, and that it was written 1876, instead of 1877, by a blunder; how this is, we are not called upon to decide.

Whether or not, this note was placed in her hands, by Parker, as a security for her estate transferred into his custody and control, and was received or retained by her as such, after arriving at the age of majority, seems now to be a matter of dispute; but, it is conceded, that the sum expressed therein was the exact amount of that estate, and it is not pretended that it had any other consideration to support it. Judgment was obtained against Parker for the full amount of the note, with the unpaid interest, and the same still remains open and unsatisfied.

This suit was subsequently brought by Emily L. Browning to recover from the firm of Lewis & Parker the said sum of $10,000; at the trial a verdict was rendered against the defendants for the whole amount of the plaintiffs' claim; the court below being of opinion, however, that there was no evidence to justify the verdict as to the $4,226, the plaintiffs, pending a motion for a new trial, filed a remittitur for that portion of the verdict.

The theory of the plaintiffs' case is, that the guardianship having terminated, and the guardian having claimed all the credits he desired, and placed her balance at the service of the

firm of Lewis & Parker, it is her right to recover it in this form. It is objected in the first place, that the Court of Common Pleas had no jurisdiction of the cause; that the initial proceedings, for the recovery of the estate of the ward, should have been in the Orphans' Court, which had exclusive jurisdiction of the subject matter of the suit.

The act of 29th March, 1832, in its 10th section, provides that a guardian, unless previously discharged or removed, shall, on the arrival of his ward at full age, settle in the Register's office a full and complete account of his management of his minor's property under his care; and that the decree of the Orphans' Court, upon such final account, shall be conclusive upon all parties, unless reversed, &c. It has been repeatedly held that the jurisdiction of the Orphans' Court over all matters of account, between guardian and ward, is exclusive. Denison *v.* Cornwell, 17 S. & R., 374; Comm'th *v.* Lockwood, 18 Pitts L. J., 10; Wills' Appeal, 9 Pa. St., 103. Although a guardian may have made a private settlement with his ward, on his arriving at age, it is well settled, that he may still, in a proper case, within a reasonable time, be required to file and settle his account in the Orphans' Court. Lukens' Appeal, 7 W. & S., 48; Stanley's Appeal, 8 Barr, 433. But if such settlement shall have been in good faith, and on full deliberation, is full and fair, is accompanied by a release, executed under no mistake or misapprehension, and has been acquiesced in by the parties, it may without doubt be treated as a waiver of the legal right to an account in the Orphans' Court, and its terms may be enforced in the Common Pleas, as other contracts are there enforced. In Marr's Appeal, 28 P. F. S., 66, it was held that after a ward had arrived at full age, he might waive his right to an account in the Orphans' Court, and join his guardian in asking for his discharge; and that the decree for his discharge could not be vacated, without proof of some specific act of fraud in obtaining it, or of some injury occasioned by it.

The Orphans' Court, having exclusive jurisdiction in all matters of account between guardian and ward, except where its exercise is thus expressly waived, it seems quite clear that the trust estate must continue in the control of the guardian, subject only to the order and discretion of the Orphans' Court, until he shall have accounted as the law requires; for the accounting may show large disbursements, or exhibit a balance in his favor. If the ward upon his arriving at age, may appropriate his estate wherever it may be found, in the hands of third persons, under investment of his guardian, the latter may be left without assets with which to account, or to cover what may be owing to him, or what he may have made himself liable for.

[Lewis *v.* Browning.]

This action in the Common Pleas, therefore, if sustainable in its present form, in the nature of the case, can only be sustained upon the assumption of a previous settlement between the guardian and his ward, by the terms of which the *quantum* of the trust fund has been definitely ascertained, its identity fixed, and the trust expressly or impliedly renounced. In such a case, although the investment may have been originally made in the name of the guardian, equity would, we think, compel the use of his name for the benefit of the ward in an action instituted for its recovery. In the case at bar, there was evidence of such a settlement, accompanied by a release to the guardian from all liability as such. As the ward was confessedly entitled to the balance exhibited by the account, and no relinquishment of it to Lewis was contemplated by way of gift or gratuity, and as no part of that admitted balance was by him then or afterwards paid, although payment was therein expressly acknowledged, the release would, in the first instance, be taken as executed upon the footing of an equitable assignment of the then actually existing investment. And if Mrs. Browning, at the time of the release, did not know that she held the note of Parker for $10,000, or that Parker by a transfer from Lewis had become the custodian of the fund formerly in Lewis's hands; if she executed the release upon the faith of representations of Parker and also of Lewis that they, and not Parker, were immediately responsible to her for the moneys in their hands, the defendants would, in view of Parker's intervening insolvency, be precluded from denying the representations so made, by means of which she was misled to her injury.

These were, without doubt, the substantial and material questions of fact involved in the case, and which should have been submitted to the jury. The learned Judge, however, appears to have taken a different view of the case. He seemed to have supposed, and so instructed the jury, that the effect of the release, if it was not vitiated by fraud, was to discharge Lewis, not only as guardian, but from all responsibility whatever for the money, and the question was submitted to the jury whether or not its execution had not been induced by fraud or unfairness. The learned Judge says: "If Mr. Lewis had imposed upon her, had got her to sign the release not knowing what she signed, had used fraud or deception it might not be good; or if there was any fraud practiced upon her, but it is now for you to consider as to whether she deliberately signed that release. What was her understanding at the time? I do not think that in her testimony she throws any light upon what her thought was as to what she was doing at the time she signed it. She said she signed the release. She said she

was requested the day before by her mother, and I think she admits that Mr. Lewis came there the night before to get her to go to Chester in the morning, and to sign his release as guardian. I do not think she testified as to any understanding of hers at that time of what responsibility still remained upon her uncle. It is, however, for you to consider whether there are any circumstances showing fraud in the obtaining of that release."

Now the suit is not brought against Lewis as guardian, nor otherwise in his individual capacity, but against the firm of Lewis & Parker. If the release was induced by artifice and fraud, the responsibility of the guardian would remain, as if it had never been executed, and the plaintiff's right of action would be against him in his official capacity. This suit, therefore, as we have said, is necessarily founded upon an acceptance of the settlement and the release of the guardian, which together are in the nature of a renunciation of the trust, and operate as an assignment of the fund, to the *cestui que trust.* The jury found for the plaintiff, and this, under the charge, was equivalent to a finding that the settlement and release were affected with fraud, and were, upon that ground, of no binding force or effect whatever. If the release, in the absence of fraud, operated to discharge Lewis not only as guardian, but from all liability whatsoever, a verdict for the plaintiff as against Lewis must necessarily have resulted from a conviction in the minds of the jurors that the settlement, or the release, or both, were upon the ground of fraud wholly invalid. But in our view of the case the plaintiff, to sustain her suit, is bound to accept the guardian's settlement, and to ratify the release; her failure so to do is necessarily fatal to her recovery; if she repudiate the settlement she must resort to the Orphans' Court, which alone has jurisdiction to determine the amount of her estate in the hands of the guardian; whilst the acceptance of the release is the evidence of her right, independently of her guardian, to recover it.

The cause was submitted to the jury upon a question of fact, concerning which there was not, and, in the nature of the case, could not have been any dispute; the plaintiff's case was wholly dependent upon the validity of the settlement and of the release.

The defendants freely admitted the validity of both, whilst the plaintiff could say nothing to impeach either. Although the plaintiff testified that she did not know the full purport of the papers she signed, she did sign them, and this proceeding is founded upon them.

We are of opinion, therefore, that the charge of the learned court was misleading in its character; the attention of the

jury was diverted from the real question in the cause to the consideration of a question which was not involved in its determination.

The judgment is therefore reversed, and a *venire facias de novo* awarded.